IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

SHERRY M.,[1]                         )
      Plaintiff,                    )     Civil Action No. 5:18-cv-00149
                                      )
v.                                    )     MEMORANDUM OPINION
                                      )
ANDREW M. SAUL,[2]                    )     By:    Joel C. Hoppe
Commissioner of Social Security,      )            United States Magistrate Judge
      Defendant.                    )

      Plaintiff Sherry M. asks the Court to review the Commissioner of Social Security's final

decision denying her claims for disability insurance benefits ("DIB") and supplemental security

income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§

401–434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c).

ECF Nos. 12, 13. Having considered the administrative record, the parties' briefs and oral

arguments, and the applicable law, I find that substantial evidence supports the Commissioner's

denial of benefits. Accordingly, the decision will be affirmed.

## I. Standard of Review

      The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Andrew M. Saul became Commissioner of Social Security in June 2019. Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or

equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 426.920(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In November 2015, Sherry filed for DIB and SSI alleging she was disabled by an "open distal clavicle excision in [the] right shoulder." *See* Administrative Record ("R.") 574, 584, 687–93, 694–98, ECF No. 8. She was forty-nine years old, or a "younger person" under the regulations, when she allegedly became disabled on March 1, 2013. R. 584; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied her claims initially in January 2016, R. 574–95, and upon reconsideration that May, R. 596–617. On August 7, 2017, Sherry appeared with counsel and testified at an administrative hearing before ALJ Stephanie Nagel. R. 544–72. A vocational expert ("VE") also testified at this hearing. *See id.*

ALJ Nagel issued an unfavorable decision on January 30, 2018. R. 44–53. She first found that Sherry had not worked since March 2, 2013, and that she met the Act's insured-status requirements through December 31, 2017.[4] R. 47. Sherry had two severe medical impairments:

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

[4] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for DIB, Sherry had to "prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 656. Sherry's insured status is not relevant to her SSI claim. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501.

disorder of the right shoulder status-post surgeries and obesity. *Id.* Her shoulder disorder did not

meet or equal Listing 1.02(B), however, because she still could "perform fine and gross

movements effectively[.]" *Id.* Sherry had the residual functional capacity ("RFC") to perform

"light work"[5] except she could "stand and walk four hours each in an eight-hour workday,"

frequently climb ramps/stairs; occasionally reach overhead with the right arm, stoop, kneel,

crouch, and tolerate exposure to extreme cold; and never crawl. R. 48. The exertional limitations

ruled out Sherry's return to her past work as a housekeeper. R. 51. Finally, based on the RFC

finding and the VE's testimony, ALJ Nagel concluded Sherry was not disabled after March 2013

because she still could perform certain occupations (counter/rental clerk, parking lot attendant,

order clerk) that offered a significant number of jobs in the national economy. R. 52; *see* R. 566–

67, 569–71.

     Sherry asked the Appeals Council to review that decision, submitting with her request

roughly 500 pages of additional medical evidence dated July 10, 2017, through April 23, 2018.

*See* R. 2, 13–40, 61–543. The Appeals Council accepted, but "did not exhibit," the evidence

created before ALJ Nagel issued her decision on January 30, 2018, because the information did

"not show a reasonable probability that it would change the outcome of th[at] decision." R. 2

(citing R. 61–543). The Appeals Council rejected the post-dated evidence because the

information did "not relate to the period at issue" and therefore did not affect ALJ Nagel's

decision that Sherry was not disabled on or before January 30, 2018. *Id.* (citing R. 13–40). The

Appeals Council ultimately declined to review the ALJ's decision, R. 1, and this appeal

---

[5] The full range of "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. §§ 404.1567(b), 416.967(b), plus sitting and standing/walking for about six hours each in an eight-hour workday, SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

followed.

## III. Discussion

Sherry's arguments relate to her severe right-shoulder impairment. *See* Pl.'s Br. 8–16, ECF No. 18-1. First, she asserts ALJ Nagel should have found the impairment met Listing 1.02B because chronic shoulder pain limited Sherry's "range of motion and fine motor movements." *Id.* at 11–12. Second, she challenges ALJ Nagel's conclusion that her testimony describing debilitating shoulder pain was not entirely consistent with other evidence in her record. *Id.* at 12. She also challenges ALJ Nagel's decision to give "great weight" to the DDS reviewing physicians' medical opinions and "less weight" to a much more restrictive RFC assessment from Cori Pflugradt, PA-C, Sherry's primary care provider. *Id.* at 14–15. Finally, Sherry objects to how the Appeals Council handled some of the additional evidence she submitted with her request for review. *See id.* at 12–14. Her arguments are not persuasive.

*A.      Summary*

Sherry used to work as a housekeeper for Bridgewater College. R. 778. In June 2010, she fell off a ladder at work and injured her right shoulder. R. 778, 801. Sherry continued to do "light duty housekeeping" despite chronic pain, but she had some trouble with overhead activities like washing windows, especially if she brought her "right hand across her head in the adducted position." R. 801. In January 2012, David Witmer, M.D., recommended arthrosporic decompression to address Sherry's "impingement symptoms" after they "did not respond significantly" to subacromial injections. R. 802. Thirteen months later, Sherry returned to Dr. Witmer's clinic with "similar complaints" of chronic right shoulder pain. R. 800. Dr. Witmer recommended "arthroscopic decompression and open excision of distal clavicle." *Id.* He

expected Sherry would see "significant improvement" in her symptoms and would have only "minimal impairment" after surgery and rehabilitation. *Id.*

Sherry had outpatient surgery on March 26, 2013. R. 799. On April 9, she reported "doing well" and exhibited active range of motion to 90 degrees with full passive range of motion. *Id.* Dr. Witmer told Sherry to continue with physical therapy and "stressed the importance of working aggressively" to improve range of motion in the right shoulder. *Id.* Four weeks later, Sherry reported "considerable benefit" from physical therapy. R. 798. She could not "bear weight in her right arm as far as her work responsibilities" were concerned, though. *Id.* Dr. Witmer administered a cortisone injection for postoperative inflammation. *Id.* That summer, he opined Sherry could resume "light duty" work, *id.*, that did not require either "repetitive overhead use of the right arm" or "overhead lifting greater than 20 pounds," R. 797. Sherry attended physical therapy three times a week through the end of 2013. *See* R. 793–96, 845–913. By December, Dr. Witmer noted she had "excellent" range of motion and her strength was "improving" despite some ongoing "discomfort" in the shoulder. R. 793. Sherry was also looking for a new job, so Dr. Witmer gave her a work note with the same restrictions limiting "the weight she can lift and the frequency of overhead" work with the right arm. *Id.*

In January 2014, Dr. Witmer opined that Sherry's right shoulder showed "definite improvement" since her arthroscopic surgery, but she "intermittently had exacerbations of pain in her recovery requiring cortisone injections" about once every eight weeks. R. 792; *see* R. 793–96. The injections "improve[d] her symptoms for several months." R. 792. Sherry described her pain as a constant mild-to-moderate aching with intermittent sharp or burning pain aggravated by cold weather, using her right arm "too much," and pushing or lifting "heavy" household objects. R. 778 ("She reports her current pain level as 1/10, worst 4/10 and best 1/10.").

During a physical work performance evaluation, Sherry could lift, carry, and push twenty-five pounds, and pull twenty pounds, with mild pain in the right shoulder; sit, stand, and walk for at least five minutes each; and twist repetitively from side to side with some pain. R. 784. She had "decreased" strength and slightly diminished range of motion (15% deficit) in the right shoulder compared to the left. R. 781, 785. Occupational therapist Jane Bielefeld opined that Sherry could return to full-time work "within the light range," including lifting/carrying twenty pounds occasionally and ten pounds frequently, standing/walking for most of the workday, and sitting without limitation. *See* R. 778–81. She should not do two-handed "overhead work," R. 781, but she could reach in other directions with her right arm and use her right hand without significant restriction, R. 778 ("Frequently: Right – Reaching forward (far), Reaching lower surfaces; Constantly: Right – Handling, Reaching forward (near)."). Overall, Ms. Bielefeld opined that the "distal clavicle excision yield[ed] 10% impairment" of Sherry's right upper extremity. R. 786. Dr. Witmer endorsed this functional assessment, adding that these were likely "permanent restrictions" and Sherry should consider rehabilitation. R. 792. Over the next year, Sherry returned to Dr. Witmer's clinic every few months for cortisone injections and, on occasion, to renew her prescription pain medications. *See* R. 788–91. She consistently reported the medications helped and the injections provided at least "intermittent" or "short-term" relief. *See* R. 789–91.

On December 22, 2015, Sherry saw Shawne Bryant, M.D., for a consultative physical examination. R. 805–08. She endorsed "continual right shoulder pain" since June 2010, which limited her abilities to reach, lift, and use her right hand. R. 805. She estimated she could "sit 4 hours at a time, stand 1 hour, [and] lift 15 pounds with both arms." *Id.* Sherry lived alone and could do her own "housecleaning and cooking." *Id.*; *see also* R. 587 ("[S]he is able to walk

around the grocery store, shop in stores fine. . . . She is able to clean her home, cannot mow her yard, as she cannot pull the start[er].”). On exam, Sherry had full strength and range of motion in all extremities, R. 806–07, “except for external [shoulder] rotation which was 25 degrees bilaterally,” R. 806. “[S]ome tenderness of the right shoulder was noted to palpation.” R. 807. An X-ray of the right shoulder showed “resection of the distal aspect of the clavicle,” but no evidence of fracture, dislocation, subluxation, abnormal soft tissue calcification, lesions, or “other significant findings.” R. 821. Dr. Bryant opined that Sherry could “lift and carry 15 pounds frequently and 30 pounds occasionally, . . . perform manipulative maneuvers frequently and right shoulder reaching occasionally, left shoulder frequently.” R. 807. Morbid obesity would limit Sherry to standing and walking for three to four hours for “an hour [or] hour and one-half at a time.” *Id.* She would also be limited to “occasional bending, stooping, crouching, and squatting secondary to her obesity.” *Id.*

James Wickham, M.D., and Josephine Cader, M.D., reviewed Sherry’s records for DDS in January and May 2016, respectively. R. 574–95, 596–616. Both physicians opined that Sherry could lift, carry, push, and/or pull twenty pounds occasionally and ten pounds frequently; sit and stand/walk for about six hours each during an eight-hour workday; frequently climb ramps/stairs; occasionally stoop, kneel, and crouch; and never crawl or climb ladders, ropes, or scaffolds. R. 579–80, 589–90, 602–03, 612–13. They attributed these limitations to Sherry’s obesity, history of right shoulder surgery, “mildly decreased external shoulder rotation, full 5/5 strength throughout,” and normal gait. R. 579, 589, 602, 612. Neither physician identified any limitations on reaching, gross manipulation, or fine manipulation. *See* R. 580, 590, 603, 613.

In May 2016, Sherry established care with Cori Pflugradt, PA-C, at Timber Way Health Center. R. 917–22, 1000. She reported constant right shoulder pain that “minimal[ly]” responded

to different NSAIDs and regular cortisone injections. R. 917. On exam, Sherry weighed 315 pounds (BMI 50.0), but had a normal gait, full range of motion, and normal strength "in all major muscle groups." R. 918. PA Pflugradt assessed morbid obesity and "unspecified" joint pain in both upper extremities. R. 920. That June, Sherry told PA Pflugradt that she could not tolerate the gabapentin a provider had prescribed for her shoulder pain, so she did not take it. R. 1125. A recent X-ray showed "mild degenerative disc disease at C4-C5," *id.*, but no other abnormalities to explain Sherry's chronic "right-sided neck and shoulder pain," *see* R. 1085. PA Pflugradt did not note any relevant findings on physical exams in June or September 2016. *See* R. 1124–27, 1205–06.

On October 10, Sherry gave PA Pflugradt "paperwork to be filled out for disability," which Sherry described as "mostly due to right shoulder pain" with "some slight left shoulder pain and cervical DDD and lower back pain." R. 1245. Sherry said that her March 2013 shoulder surgery was "very successful, but she still ha[d] some persisting deficits," including "some decreased grip strength in her right hand" and an inability "to work over her head or do much lifting with her right arm." *Id.* She rated her pain at "about a 5/10 when resting and about 7-8/10 when using [her] right arm." *Id.* On exam, Sherry exhibited "tenderness, pain," and "decreased" range of motion and strength in the right shoulder, "decreased grip strength" in the right hand, and "[p]ositive empty can and Hawkins-Kennedy test[s] on the right shoulder." R. 1246–47; *see* R. 1244 ("Patient appears to have moderate-severe limitation of her right shoulder."). She also had "decreased" range of motion in the left shoulder, but the rest of her physical exam was normal. *See* R. 1246–47. PA Pflugradt told Sherry to keep using diclofenac on her right shoulder and noted they could "consider" physical therapy or surgery if the pain persisted. R. 1244.

On October 11, PA Pflugradt completed the Physical RFC Questionnaire that Sherry brought to the previous day's appointment. R. 815–19. She opined that Sherry suffered from "constant" moderate-to-severe pain in the right shoulder "exacerbated [by] exertion" and "decreased grip strength" in the right hand, as well as pain radiating into both arms and hands. R. 815 ("Pain is about 5/10 when resting and 8/10 when using."). Sherry's shoulder impairment could "be managed minimally with medicine or surgical intervention, but ultimately [her] condition will be permanent." *Id.* Based on her most recent exam findings, R. 815 (citing R. 1246–47), PA Pflugradt opined that Sherry could walk about five city blocks without stopping to rest or experiencing severe pain, stand for thirty minutes and sit for one hour before needing to change positions, and sit and stand/walk for "about 4 hours" total during an eight-hour workday, R. 816–17. She could "occasionally" lift and carry ten pounds, look up or down, twist, stoop, or climb stairs; "rarely" lift and carry twenty pounds or turn her head side to side; and never lift/carry fifty pounds, crouch/squat, or climb ladders. R. 817–18. Sherry also had "significant limitations" on gross manipulation and reaching in any direction bilaterally, right more so than left, but no restrictions on fine manipulation. R. 818. PA Pflugradt opined that Sherry had experienced these symptoms and limitations as far back as June 2, 2010. R. 819.

On December 19, 2016, Sherry told PA Pflugradt that her right shoulder pain "comes and goes and [was] often worse with cold weather and excessive arm movement." R. 1290. She reported "[n]o major concerns" at this visit. *Id.* Nortriptyline was "working fairly well" to control her upper extremity pain, but she did not want to increase her dose because it might make her too drowsy. *Id.* Sherry was "the sole care giver for her parents and want[ed] to be alert if they needed her." *Id.* PA Pflugradt encouraged Sherry to exercise and referred her to orthopedics to discuss her disability paperwork. *See* R. 1289, 1290 ("Will set up referral to orthopedics today as patient

needs to follow up with them for disability work. . . . She needs to see orthopedics due to her disability paperwork according to her lawyer."). Sherry saw Christopher Hess, M.D., for an orthopedic consult later that month. R. 1306–11. She reported chronic "moderate to severe" sharp pain in her neck that radiated to both shoulders and down her right arm. R. 1307. The pain was worse when looking up or turning her head, but it responded to Nortriptyline. *Id.* Dr. Hess observed that Sherry walked with a non-antalgic gait, had normal bulk and tone, and exhibited full strength throughout both upper extremities, but had "decreased" range of motion in the cervical spine and one or both shoulders. R. 1309. She also endorsed tenderness to palpation along the right cervical paraspinal muscles and the subacromial region of the shoulders. *Id.*

Dr. Hess opined that Sherry's presentation was "consistent with Donnelly intrinsic shoulder pain" and her neck pain was likely "secondary to poor [body] mechanics from her shoulder injury." R. 1306. He referred her to physical therapy and instructed her to continue pain medications. *Id.* At her first therapy session, Sherry reported "constant" aching pain in the right shoulder ranging from 3/10 at best and 8/10 at worst. R. 1331. The pain caused "little difficulty" with walking short distances, pushing, pulling, reaching, grasping, and lifting "very light objects," R. 1349–50, but "moderate difficulty" with carrying, standing, and walking long distances. R. 1349. On exam, Sherry had normal active range of motion in the right shoulder, R. 1330, but decreased motion in the neck and diminished strength in both shoulders, R. 1331–32. Her pain, range of motion, and shoulder strength improved with twice weekly physical therapy. *See* R. 1404–06, 1448–50. In January 2017, the therapist noted that Sherry's "poor posture" likely explained why home exercises provided only "temporary relief." R. 1404.

An MRI of Sherry's right shoulder taken in February 2017 showed "evidence of a type II SLAP tear" with "tendinopathy of the supraspinatus and infraspinatus tendons." R. 1713. She

rated her shoulder pain as "4/10, worse at times" especially when lifting or "reaching up and back." R. 1715. Chad Muxlow, D.O., noted Sherry had full (5/5) strength with resisted internal and external rotation, diminished (4/5) strength with resisted forward flexion, and range of motion from zero to 180 degrees of forward flexion and abduction with pain above 90 degrees. R. 1714. Sherry chose to "continue[] conservative treatment with ice, anti-inflammatories, . . . therapeutic exercises, and cortisone injections". *Id.* That March, Dr. Muxlow recommended "surgery for right shoulder arthroscopy with biceps tendinosis, subacromial decompression [and] debridement" after Sherry denied "any significant relief" from her most recent injection. *Id.* Sherry had outpatient shoulder surgery on May 9, 2017. *See* R. 1863–67, 1876. On July 10, Dr. Muxlow instructed Sherry to "avoid heavy lifting or repetitive overhead activities" for the time being. R. 2100. She now had normal active range of motion without complaints of pain in the right shoulder. *Id.* Dr. Muxlow noted Sherry could take Tylenol as needed for her persistent mild-to-moderate pain with activity and that they "may consider" resuming injections if she still had "significant discomfort" in six weeks.[6] *Id.*; *see* R. 2101.

In August 2017, Sherry testified that she applied for disability benefits because her injured right shoulder was "not getting any better." R. 555. She still had constant pain in that shoulder, which usually felt like a "three to four" on a ten-point scale. R. 557. The pain could "go as far as a ten" depending on how she used her right arm. This typically happened on a "[m]onthly" basis. R. 559. Doctors still had not "offer[ed] to do anything . . . that help[ed] relieve" the pain. *Id. But see* R. 563 (testifying that pain medication "helped some"). Sherry could use her right upper extremity for fifteen minutes at one time before needing to take a

---

[6] In March 2018, one of Dr. Muxlow's physician's assistants wrote a letter noting he would give Sherry a referral to pain management, but she could see him "again to consider additional conservative treatments including steroid injection[s] or continued formal physical therapy." R. 39; *see* Pl.'s Br. 13.

thirty-minute break. R. 558. She had trouble reaching in front, pulling things towards her, trying to clean the house, and grocery shopping. *Id.* Physical therapy had helped her range of motion, but she had not regained "totally . . . full range of motion yet." R. 562. Sherry did not have any problems with her left upper extremity. R. 558. She could "walk around for about two hours," and stand in one position for about thirty minutes, before needing to sit for at least half an hour. R. 556–57. Sherry drove at least ten miles every day, R. 550, and tried to do whatever housework she could manage, R. 560. In the evenings, she usually fixed dinner for herself and her adult son and watched television. R. 562–63. She did not do any yardwork. R. 560.

B.        *The ALJ's Decision*

ALJ Nagel considered this evidence throughout her written decision. She found that Sherry's obesity and "disorder of the right shoulder, status-post surgeries" were "severe" medical impairments because they had "more than a minimal effect on [her] ability to perform basic work activities," R. 47, which according to the regulations include "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," 20 C.F.R. §§ 404.1522(b)(1), 416.922(b)(1). Her shoulder disorder did not meet Listing 1.02(B), however, because she still could "perform fine and gross movements effectively[,] as evidenced by her ability to drive a car and prepare meals – activities that necessarily require some minimal movement of the upper extremities." R. 47 (citing R. 550, 560, 562); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.00(B)(2)(c), 1.02(B). Sherry's weight also exacerbated her joint impairment, but the obesity was "not of listing-level severity" in part because she "retain[ed] the ability to ambulate effectively," R. 48. *See* R. 49.

Turning to Sherry's RFC, ALJ Nagel explained the weight she afforded to relevant evidence in the record, including objective findings on physical exams and diagnostic images, the conflicting opinions about Sherry's functional limitations, the treatment Sherry received for

her shoulder disorder, and Sherry's statements both to her providers and to the agency. *See* R. 48–51. ALJ Nagel credited Sherry's complaints of right shoulder pain and alleged "difficulty standing, walking, lifting, reaching, and bending," R. 48, to a degree by restricting her to "less than the full range of light work" involving only occasional stooping, kneeling, crouching, overhead reaching with the right upper extremity, and exposure to extreme cold, R. 49. *See* R. 50 ("Lifting and carrying heavy items and performing certain postural and manipulative activities may worsen shoulder pain."). ALJ Nagel also pointed to specific contradictory testimony and medical evidence in explaining why she found Sherry's and PA Pflugradt's statements describing more extreme functional limitations to be less persuasive than Dr. Bryant's and the DDS physicians' medical opinions. R. 48–51. She did not mention Dr. Muxlow's assessments.

*C.      Analysis*

*1.      Listing 1.02B*

The Listings are examples of medical conditions that "ordinarily prevent a person from working" in any capacity, "not just [in] substantial gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532–33 (1990) (quotation marks omitted). If a claimant's severe impairment(s) "satisfies all of the criteria of [the corresponding] listing, including any relevant criteria in the introduction," 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3), then the claimant is "entitled to a conclusive presumption" that he or she is disabled, *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)). *See Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). To make this determination, the ALJ must identify the impairment(s) and "compare[] each of the listed criteria" to the relevant evidence in the record. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).

Listing 1.02(B) requires medical evidence showing, among other things, gross anatomical deformity "of one major peripheral joint *in each* upper extremity . . . resulting in [the] inability to perform fine *and* gross movements effectively." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02(B) (emphasis added). "Inability to perform fine and gross movements effectively means an extreme loss of function of *both* upper extremities," such that the deformity "interferes very seriously" with the person's ability to "sustain[] or complete activities" of daily living that involve "reaching, pushing, pulling, grasping," and fine motor movements. *Id.* § 1.00(B)(2)(c) (emphasis added). Sherry testified that her chronic pain and alleged functional limitations were "all in the right arm" and she did not have "any problem with [the] left arm." R. 558. Treatment notes showed she consistently had full strength in both upper extremities, R. 793, 806–07, 918, 1309, 1714, 1404–06, 1448–50, despite sometimes reporting subjective numbness or "decreased" grip strength in the right hand only, R. 800–01, 1245. Drs. Bryant and Witmer opined Sherry could perform fine or gross manipulative activities without limitation throughout an eight-hour workday, R. 786, 792, which ALJ Nagel credited over PA Pflugradt's opinion that she could use her hands to grasp, turn, or twist objects at most four hours, R. 818. *See* R. 49–50. This evidence "amply support[s]" ALJ Nagel's conclusion that Sherry's unilateral shoulder disorder did not meet Listing 1.02(B). *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Sherry disagrees with ALJ Nagel's evaluation of the pain and limitations "related to her right shoulder," Pl.'s Br. 10, but she does not "point to any specific piece of evidence not considered by the [ALJ] that might have changed the outcome of [her] disability claim" at this step, *Reid*, 769 F.3d at 865 (emphasis omitted). *See* Pl.'s Br. 9–11.

### 2. *RFC Determination*

A claimant's RFC is her "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite all her medical impairments and symptoms.[7] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

The ALJ has broad discretion to decide whether an alleged symptom or limitation is supported by or consistent with other relevant evidence, including objective evidence of the underlying medical impairment, in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and her decision built an "accurate and logical bridge from that evidence to [her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019).

Sherry first asserts that ALJ Nagel "erred when evaluating" Sherry's symptoms because she purportedly "ignored substantial evidence in the record supporting [Sherry's] testimony regarding her level of pain" and impingement symptoms affecting her right shoulder. The

---

[7] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. §§ 404.1502(i), 416.902(n).

regulations set out a two-step process for ALJs to evaluate symptoms as part of the RFC assessment. *See Lewis*, 858 F.3d at 865–66. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce," *id.* at 866, the actual pain or other symptoms "in the amount and degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637. "The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects" after considering all the relevant evidence in the record. *Lewis*, 858 F.3d at 866; *see Mascio*, 780 F.3d at 639; *Hines*, 453 F.3d at 565. A reviewing court will uphold the ALJ's credibility determination if her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

ALJ Nagel found that Sherry's severe shoulder disorder and obesity could reasonably be expected to cause constant pain and other physical symptoms, but that Sherry's statements describing the "intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent" with the objective medical and other relevant evidence in the record. R. 49. She credited Sherry's complaints of right shoulder pain and alleged "difficulty standing, walking, lifting, reaching, and bending," R. 48, to a degree by restricting her to "less than the full range of light work" that required only only four hours standing/walking and occasionally stooping, kneeling, crouching, overhead reaching with the right upper extremity, or exposure to extreme cold, R. 49. *See* R. 50. But, ALJ Nagel also cited specific medical records and other evidence

supporting her conclusion that Sherry's pain was not "so continuous and/or so severe" that it prevented her "from working a full eight hour day," *Hines*, 453 F.3d at 565. *See Bishop*, 583 F. App'x at 68. For example, Sherry's post-surgery physical examinations "generally showed benign findings including [the] right shoulder with full range of motion without significant pain, negative impingement, no significant tenderness to palpation, and full grip and muscle strength[.]" R. 49 (citing R. 792, 804–08, 918, 1714). Some records reflected positive impingement testing or tenderness to palpation, "but these abnormal clinical presentations were offset by generally benign findings" documented throughout the relevant period. *Id.* Sherry's treatment with "medications, injections, physical therapy, and shoulder surgery" also was "generally successful in controlling" her pain, or at least reducing it to the point that Sherry could do work that did not involve "heavy lifting" or more than "occasional"[8] overhead reaching with the right arm. R. 49–50 (citing R. 762, 778–86, 845–913, 789, 803, 1589). Finally, ALJ Nagel noted that Sherry looked for work in 2014 and testified in 2017 that she could "do household chores, drive a car, care for her [family], and maintain her household despite her impairment."[9] *Id.* (citing R. 549–50, 560–63, 800).

These were legitimate reasons for ALJ Nagel to conclude Sherry's shoulder pain was not as debilitating "as she described at the hearing," R. 51; *see* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), and they are amply supported by the record as a whole, *see, e.g.*, R. 557, 559, 562–62, 587, 778–81, 784–86, 789–93, 797, 805–07, 918, 1244–45, 1290, 1307, 1309, 1330,

---

[8] "'Occasionally' means occurring from very little up to one-third of the time" and "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5.

[9] ALJ Nagel mistakenly found that Sherry "care[d] for her son," whom the ALJ described as "a child." R. 49, 50. Sherry testified that she did not have any dependent children and that her 33-year-old son lived with her, but that he worked "a lot" so he could not help her around the house very much. R. 550, 560. However, Sherry did testify that she visited her parents every day, R.550, and in December 2016 she reported that she was their "sole" caregiver, R. 1290.

1349–50, 1404–06, 1448–50, 1714, 2100. Sherry asserts ALJ Nagel "ignored" evidence that she suffered "from impingement symptoms in her right shoulder since 2012," and that she "complained of pain at every visit" to her orthopedic specialists, primary-care providers, and physical therapists. Pl.'s Br. 12. While ALJ Nagel did not cite each instance where Sherry complained of shoulder pain, the fact that she discussed these aspects of the treatment record in explaining how she weighed Sherry's testimony belies any suggestion that she "ignored" those complaints. *See Ladda v. Berryhill*, 749 F. App'x 166, 171 (4th Cir. 2018); *Reid*, 769 F.3d at 865; *Presnell v. Colvin*, No. 1:12cv299, 2013 WL 4079214, at *4 (W.D.N.C. Aug. 13, 2013) ("Consideration does not require favorable consideration."). ALJ Nagel acknowledged Sherry still had pain after her shoulder surgeries, and she accounted for that pain to a degree by restricting Sherry's exertional, postural, and manipulative activities. *See Ladda*, 749 F. App'x at 171. Moreover, Sherry did "not have to be pain-free in order to be found 'not disabled,'" particularly considering ALJ Nagel found she could work only "at a lower exertional level" than she did before. *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1457–58 (4th Cir. 1990)), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011).

Sherry also argues ALJ Nagel did not "address the limitations noted" by Drs. Witmer, Hess, and Muxlow, which she maintains supported PA Pflugradt's restrictive RFC assessment. Pl.'s Br. 14–15 (citing R. 916, 999, 1074, 1124–25, 1203, 1244, 1289, 2004). Sherry does not specify which "limitations" she is referring to *id.*, and the cited pages merely document her own statements and PA Pflugradt's entries documenting her diagnoses, medication refills, and referrals to orthopedics or radiology, R. 916, 999, 1074, 1124–25, 1203, 1244–45, 1289, 2004.

A few months after Sherry's first shoulder surgery in 2013, Dr. Witmer opined that

Sherry could resume "light duty" work, R. 798, that did not require "repetitive overhead use of the right arm" or "overhead lifting greater than 20 pounds," R. 797. In January 2014, Dr. Witmer endorsed the occupational therapist's opinion that Sherry's surgery resulted in 10% permanent impairment of the right upper extremity, but she could return to full-time work "within the light range," including using either arm to reach in most directions, so long as the job did not involve two-handed "overhead work," R. 781. *See* R. 778–81. In December 2016, Dr. Hess opined that Sherry's presentation was "consistent with . . . intrinsic shoulder pain" and her neck pain was "secondary to poor [body] mechanics from her shoulder injury." R. 1306. Sherry's pain, range of motion, and shoulder strength improved with physical therapy. *See* R. 1404–06, 1448–50. There is no indication that Dr. Hess restricted Sherry's functional activities. In February 2017, Dr. Muxlow diagnosed a SLAP tear in the right shoulder and noted Sherry had normal range of motion and full strength with resisted internal and external rotation, but slightly diminished strength with resisted forward flexion. R. 1714. Sherry "continued conservative treatment with ice, anti-inflammatories, . . . therapeutic exercises, and cortisone injections," *id.*, followed by outpatient shoulder surgery in May 2017, *see* R. 1863–67, 1876. On July 10, she had full painless range of motion in the right shoulder. R. 2100. Dr. Muxlow instructed her to "avoid heavy lifting [and] repetitive overhead activities" using the right arm. *Id.*

Sherry does not explain how any of this evidence supports PA Pflugradt's opinion that she could lift at most twenty pounds (but only rarely) and use her right arm to reach in any direction for "5-10%" of an eight-hour workday, R. 817–18. *See* Pl.'s Br. 9–10, 14–15. On the contrary, Dr. Witmer's and Dr. Muxlow's medical opinions are consistent with ALJ Nagel's RFC findings that Sherry could occasionally lift twenty pounds and reach overhead with her right arm for about two hours during an eight-hour workday. R. 47, 778–81, 792–93, 797, 2100;

*see* SSR 83-10, 1983 WL 31251, at *5. The ALJ's RFC finding is also consistent with the DDS

physicians' opinions about Sherry's capacities to lift and carry, but more restrictive than their

opinions that Sherry did not have any limitations on reaching after her first shoulder surgery. R.

47, 49–50, 580, 590, 603, 613; *see Hall v. Astrue*, No. 2:09cv122, 2010 WL 4979016, at *7

(N.D. W. Va. Dec. 2, 2010) ("[A]n ALJ may rely on the opinions of a non-examining medical

source . . . if they are consistent with the record." (citing *Gordon v. Schweiker*, 725 F.2d 231, 235

(4th Cir. 1984)). Thus, while ALJ Nagel should have explained the weight she afforded Dr.

Witmer's and Dr. Muxlow's medical opinions, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), her

failure to do so in this case was harmless. *See Keaton v. Colvin*, No. 3:15cv588, 2016 WL

8452663, at *6–7 & n.4 (E.D. Va. July 11, 2016) (citing *Tanner v. Comm'r of Soc. Sec.*, 602 F.

App'x 95, 101 (4th Cir. 2015)), *adopted by* 2017 WL 875477, at *4–5 (E.D. Va. Mar. 3, 2017);

*Rivera v. Colvin*, No. 5:11cv569, 2013 WL 2433515, at *3, *5 (E.D.N.C. June 3, 2014) (citing

*Morgan v. Barnhart*, 142 F. App'x 716, 722–23 (4th Cir. 2005)).

     Although PA Pflugradt did cite her "own findings of right shoulder pain," Pl.'s Br. 14, on

the October 10, 2016 exam to support her opinions, R. 815 (citing R. 1246–47), ALJ Nagel

explained why those opinions were at odds with the "generally" benign or mild deficits

documented on other physical exams throughout the relevant time, as well as evidence that

treatment partially alleviated Sherry's pain, R. 49–50. ALJ Nagel also properly evaluated PA

Pflugradt's opinion as "other source" evidence, R. 50 (citing 20 C.F.R. §§ 404.1513(a),

416.913(a)), because physician assistants are not "acceptable medical sources" and therefore

cannot be considered "treating" providers whose medical opinions may be entitled to special

weight under the regulations, SSR 06-3p, 2006 WL 2329939, at *2 (Aug. 9, 2006). *See Vandross

v. Berryhill*, No. 8:16cv1915, 2017 WL 3328191, at *14–16 (D.S.C. July 18, 2017), *adopted by*

2017 WL 3311047 (D.S.C. Aug. 3, 2017). Accordingly, I find no reversible error in ALJ Nagel's RFC assessment.

### 3. *Additional Evidence*

Finally, Sherry objects to how the Appeals Council handled one piece of additional evidence, a letter written by Ryan Chico, P.A., dated March 7, 2018, that Sherry submitted with her request for review. *See* Pl.'s Br. 12–14 (citing R. 39). In the letter, PA Chico notes that Sherry "has continued pain in the right shoulder despite having achieved good motion, strength, and function with the right upper extremity," and that "her pain is quite similar to the pain she was having prior to surgery chronically since 2010." R. 39. He also noted they could "consider additional conservative treatments including [additional] steroid injection[s] or formal physical therapy." *Id.* He did not identify any functional limitations on Sherry's right upper extremity. *See id.* The Appeals Council rejected PA Chico's post-dated letter because the information did "not relate to the period at issue" and therefore did not affect ALJ Nagel's decision that Sherry was not disabled on or before January 30, 2018. R. 2 (citing R. 13–40).

When a claimant appeals an ALJ's ruling, the Appeals Council first makes a procedural decision whether to grant or deny the request for review. *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005). The current version of the governing regulations state, in relevant part, that the "Appeals Council will review a case" if,

> subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the [ALJ's] hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5) (2018).[10] The Fourth Circuit has long held that this

---

[10] Paragraph (b) in turn explains that "the Appeals Council will only consider additional evidence under paragraph (a)(5) if [the claimant] show[s] good cause for not informing [the agency] about or submitting

paragraph's predecessor, 20 C.F.R. §§ 404.970(b), 416.1470(b), set "forth a mandatory rule that

the Appeals Council must consider any new and material evidence relating to the period prior to

the ALJ decision in determining whether to grant review, even though it may ultimately decline

review." *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en

banc); *see also Meyer*, 662 F.3d at 704–05 (citing 20 C.F.R. § 404.970(b) (2011)). The current

version retains the language that the Appeals Council need "only consider additional evidence"

submitted to it if the additional evidence "is new, material, and relates to the period on or before

the date of the [ALJ] hearing decision," *see* 20 C.F.R. §§ 404.970(a)(5), (b)–(c), 416.1470(a)(5),

(b)–(c), but clarifies that "the Appeals Council will grant review of a case based on the receipt"

of such evidence only "if there is a reasonable probability that the additional evidence would

change the outcome of the decision," *Ensuring Program Uniformity at the Hearing and Appeals

Council Levels of the Administrative Review Process*, 81 Fed. Reg. 90,987-1, 90,991 (Dec. 16,

2016) (codified at 20 C.F.R. §§ 404, 416). *See Jerika C. v. Comm'r of Soc. Sec.*, No. 3:17cv70,

2019 WL 320623, at *3–4 (W.D. Va. Jan. 4, 2019); *Vickie W. v. Berryhill*, No. 7:17cv324, 2018

WL 4604038, at *4–5 (W.D. Va. Sept. 25, 2018).

"Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a

reasonable possibility that the new evidence would have changed the outcome.'" *Davis*, 392 F.

Supp. 2d at 750 (quoting *Wilkins*, 953 F.2d at 96). Evidence "relates to" the relevant period if it

provides additional insight into impairments, symptoms, or functional limitations that the

claimant suffered while the ALJ was reviewing her case, *Wilson v. Colvin*, No. 7:13cv113 2014

WL 2040108, at *4 (W.D. Va. May 16, 2014), even if the additional evidence was created after

the ALJ issued her decision, *Hull v. Astrue*, No. 5:10cv135, 2012 WL 896343, at *5 (W.D. Va.

_____

the evidence" within a certain time before the ALJ hearing. 20 C.F.R. §§ 404.970(b), 416.1470(b); *see* R. 2.

Mar. 15, 2012). PA Chico's letter certainly "relates to" Sherry's shoulder disorder, continued pain, and treatment regimen that ALJ Nagel addressed in her decision. *See Wilson*, 2014 WL 2040108, at *4. But, contrary to Sherry's unadorned assertion, the letter does not contain any "new and material" information, Pl.'s Br. 14, that might have changed the outcome of the ALJ's decision. *See Lisa A. v. Saul*, No. 5:18cv7, 2019 WL 2896115, at *10–11 (W.D. Va. June 28, 2019). If anything, it bolsters ALJ Nagel's conclusion that, although Sherry still had chronic right-sided shoulder pain, the numerous exam records showing "full range of motion" and normal "grip and muscle strength" in the upper extremities, R. 49; *see* R. 39, supported a finding that Sherry could perform light work with limitations on overhead reaching, R. 48–50. *See Rumble v. Colvin*, No. 2:13cv500, 2014 WL 3697500, at *15 (E.D. Va. July 23, 2014). Accordingly, the Appeals Council was not required to consider this additional evidence.

## IV. Conclusion

Accordingly, the Court will **GRANT** the Commissioner's motion for summary judgment, ECF No. 19, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: April 14, 2020

Joel C. Hoppe
United States Magistrate Judge